# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **CRIMINAL ACTION FILE NO.** |
| **GERARD MARCHELLETTA,** ) | **1:07-CR-107-TCB-AJB** |
| **a/k/a Jerry Marchelletta,** ) | |
| **GERARD MARCHELLETTA, SR.,** ) | |
| **a/k/a Jerry Marchelletta, Sr.,** ) | |
| **and THERESA L. KOTTWITZ** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## DEFENDANTS' JOINT[1] UNOPPOSED MOTION
## FOR RELEASE ON BOND PENDING APPEAL

COME NOW Defendants Gerard Marchelletta, Sr., and Gerard Marchelletta,

Jr., by and through their undersigned counsel of record and file this Joint

Unopposed Motion for Release on Bond Pending Appeal pursuant to 18 U.S.C.

§ 3143(b).

This Court should grant their request because both Marchellettas meet all of

the requirements of § 3143(b), namely: (1) they are not likely to flee or pose a

danger to the safety of any other person or the community; (2) their appeal is not

---

1. Because this is a joint motion and it does not exceed 50 pages, Defendants have
not filed a motion with this Court asking for the additional pages.

for purpose of delay; (3) their appeal raises a substantial question of law or fact; and (4) if that substantial question is determined favorably to Defendants on appeal, that decision is likely to result in reversal, an order for a new trial of all counts on which imprisonment has been imposed, or a reduced sentence that could be less than the time of the expected appellate process.

On July 9, 2008, counsel for Defendants Marchelletta, Sr. and Marchelletta, Jr. met with counsel for the Government, Assistant United States Attorney Justin Anand to consult regarding the Government's position regarding Defendants' request for bond pending appeal. After full discussion of the issues, AUSA Anand has authorized undersigned counsel to represent the following to this Court. Without in any way acquiescing or conceding that Defendants have any issues which are sufficiently meritorious to ultimately result in any relief on appeal to the Eleventh Circuit, the Government agrees that it will not oppose Defendants' request for bond pending appeal if Defendants will agree to comply with certain additional conditions of release as a requirement of bond pending appeal.

Subject to these additional conditions of release, the Government agrees that Defendants meet all the requirements of 18 U.S.C. § 3143(b), and therefore does not oppose their request for release pending appeal. Subject to the foregoing understanding that the Government does not agree that Defendants will prevail on appeal on any issue arising out of the case, and that any release on bond pending

appeal be subject to additional conditions, the Government specifically agrees that Defendants are not a risk of flight or a danger to any person or the community; that Defendants' appeal is not for purpose of delay; and that Defendants' appeal raises substantial issues as defined by § 3143(b)(1)(B). Based on these understandings, the Government does not oppose Defendants' release on bond pending appeal.

The additional conditions upon which the Government preconditions its agreement not to oppose release of Defendants on bond pending appeal are that: Defendants secure their release on bond with the entire equity in their personal residences (located at 320 Newport Bay Cove, Alpharetta, Georgia and 515 Tullamore Way, Alpharetta, Georgia). Defendants agree to house arrest which requires Defendants to remain in their homes at all times with the exception of work-related activities, church or doctors' appointments, and any other local travel approved by Defendants' Pretrial Services officer. Defendants will also be permitted to travel out of town for business-related activities with permission of Defendants' Pretrial Services officer so long Defendants make any such request at least seven (7) days prior to any proposed travel. Defendants have agreed to comply with these and any other additional restrictions that the Court may require for their release on bond pending appeal.

Defendants acknowledge that this case has been hard fought and has resulted in extensive litigation of many issues. As set forth below, Defendants are not a

risk of flight, nor do they pose any danger to the safety of any person or the community, and this appeal is not for the purpose of delay. At the end of the day, as to the issue of setting of bond pending appeal, the "substantial question" requirement is at the heart of the matter. *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985), explains that a "'substantial question' is one of more substance than would be necessary to a finding that it was not frivolous.  It is a 'close question' or one that very well could be decided the other way."

Defendants intend to present at least six issues on appeal, discussed in detail below, which meet the "substantial question" standard set out in *Giancola*.  First, the Court should have granted Defendants' requested Jury Instruction 15 relating to good faith reliance on their accountant. Second, the Court's admission of the draft of the 2001 tax returns of Defendants which were never filed nor signed was error which prejudiced them because the Government argued that this was evidence that Defendants always intended to fail to report the expenditures on their personal homes. Third, under the recent unanimous decision of the Supreme Court in *Boulware v. United States*, __ U.S. __, 128 S.Ct. 1168 (2008), the question as to the timing of the treatment of payments related to Defendants' homes and other third party payments could not be determined until after Circle's books were closed, so the recognition of those payments in the filed 2001 tax returns and payments of taxes thereon showed no crime, as the constructive income was not

realized in the year 2000.  Fourth, throughout the trial, the Government presented evidence and argument designed to prejudice the jury against Defendants based on their wealth.  Fifth, the evidence was insufficient to convict Defendants because the Government's evidence, viewed in the light most favorable to the verdict, failed to prove knowing participation and the requisite criminal intent to commit any of the charged tax violations.  Finally, the Court should have not included acquitted conduct and relied on 2001 draft tax returns that were never signed or filed when calculating the loss amount at sentencing.

If relief were granted on the fifth issue, Defendants' convictions would be reversed outright. Relief on the first, second, third or fourth ground would entitle Defendants to a new trial. Relief on the sentencing issue could result in a reduced or split sentence under U.S.S.G. § 5C1.1(b) that could be less than the total time Defendants could be expected during the appellate process. As a consequence, Defendants respectfully submit that this Court should allow them to remain free on bond pending their appeal subject to added conditions of release as requested by the Government or determined by this Court.

## Argument and Citation of Authorities

**I.   THIS COURT SHOULD PERMIT DEFENDANTS TO REMAIN ON BOND PENDING APPEAL BECAUSE THEY POSE NO RISK OF FLIGHT OR DANGER, AND THEIR APPEAL WILL PRESENT ONE OR MORE "SUBSTANTIAL QUESTIONS" OF LAW AND FACT.**

### A. The Legal Standard

Title 18, United States Code, Section 3143(b), provides in relevant part:

> (b) **Release or detention pending appeal by the defendant**.-- (1) Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, *unless the judicial officer finds--*
>
> (A) by clear and convincing evidence that *the person is not likely to flee or pose a danger to the safety of any other person or the community* if released under section 3142(b) or (c) of this title; and
>
> (B) that *the appeal is not for the purpose of delay* and *raises a substantial question of law or fact likely* to result in--
>
> (i) reversal,
>
> (ii) an order for a new trial,
>
> (iii) a sentence that does not include a term of imprisonment, or
>
> (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.
>
> If the judicial officer makes such findings, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c) of this title . . . .

*Id.* (emphasis added).

As summarized by the Eleventh Circuit in the seminal case addressing § 3143(b):

. . . under the 1984 Bail Act, a court must find the  following four factors in order to grant bail pending appeal:

     (1) that the defendant is not likely to flee or pose a danger to the safety of any other person or the community if released;

     (2) that the appeal is not for purpose of delay;

     (3) that the appeal raises a substantial question of law or fact; and

     (4) that if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed.

*Giancola*, 754 F.2d at 901.

As many courts have recognized, this standard places a district court in the difficult position of assessing the probability of its own error.  A fellow district judge in the Middle District of Florida recently faced this precise quandary:  the Honorable William Terrell Hodges, presiding in the case of *United States v. Snipes*, Case No. 5:06-cr-22, with a white collar defendant facing a similar thirty-36 month sentence.[2]  Judge Hodges addressed the difficult position district courts face when called upon to decide whether the trial they presided over might contain reversible error – a difficult task for anyone.  As Judge Hodges articulated, in such an instance, any district court will naturally assume the appeal issues are "dubious."   (Judge Hodges' Order granting release pending appeal attached as

---

2. Judge Hodges is very experienced in matters relevant to this motion.  The most significant of which is his 28-year chairmanship of the Fifth/Eleventh Circuit's Committee on Pattern Jury Instructions which drafted the "reliance on counsel/accountant" instructions discussed in Section 2, *infra*.  Judge Hodges was also a member of the District Judges Advisory Group as part of the United States Sentencing Commission.

Exhibit A, found at *United States v. Snipes*, Case No. 05:06-cr-22 (Doc. 475)). Nevertheless, in a very thoughtful analysis, Judge Hodges granted release pending appeal to Snipes.

In sum, under § 3143(b), if Defendants meet this burden of proof in establishing the foregoing factors – a burden that they embrace and, as shown below, they meet – then this Court should allow them to be released on bond pending disposition of their appeal with additional conditions set under 18 U.S.C. §§ 3142 (b) and (c).

## B.  Defendants Are Not Likely to Flee, and Pose No Danger to any Person or the Community.

Defendants are not likely to flee, and will pose no danger to the safety of any other person or the community if released on bond pending appeal.

### 1. Mr. Marchelletta, Sr.

Defendant Marchelletta, Sr., is currently released on a $75,000 unsecured bond, which was set on April 4, 2007. (Doc. 14.)  He has been on pretrial supervision since April of 2007 without incident.  Defendant has faithfully complied with all conditions of release and supervision, and has appeared in Court each time as required.

Defendant Marchelletta, Sr., is a 75% owner of Circle and is Circle's Chief Executive Officer.  He has numerous responsibilities at Circle, which employees more than 1000 people. Circle is the largest drywall contractor in the Southeast and

continues to regularly work on multi-million dollar projects.   The Circle Group currently has 40 active projects.

Mr. Marchelletta, Sr. is 73 years old.  He has been married to Mrs. Margaret Marchelletta for 52 years. Both Defendant and his wife have numerous serious medical conditions.  Defendant is blind in his right eye and has a cataract in his left eye.   Mr. Marchelletta, Sr. also suffers from high blood pressure, irregular heartbeat, and has high cholesterol levels. He regularly takes various medications and frequently sees his doctors. Mrs. Marchelletta, age 72, is seriously ill.  She suffers from Crohn's disease, heart palpitations, and high blood pressure.  Mrs. Marchelletta also has a partial blockage of the carotid artery.  She also suffers from a sclerosis of the spine, and is unable to move freely and has difficulty breathing. Due to her serious health conditions, she heavily depends on Defendant to take care of her and supervise her medical treatment.

Defendant Marchelletta, Sr. has significant family ties to this community. He and his wife are grandparents to:  Charlotte Laidler, age 3; Morgan Laidler, age 2; Quentin Laidler, age 1; Gerard "Jerry" Marchelletta, age 10; Dawson Cole Marchelletta, age 9; and Alyssa Lauren Marchelletta, age 7.  All the grandchildren live in Atlanta, Georgia.  Defendant and his wife are actively involved in their grandchildren's lives and see them frequently.   Mr. Marchelletta, Sr.'s daughter,

Joyce Laidler, and son, Jerry Marchelletta, Jr., live in the Northern District of Georgia.

### 2. Mr. Marchelletta, Jr.

Defendant Marchelletta, Jr., is currently released on a $50,000 unsecured bond. (Doc. 11.) He has been on pretrial supervision since April of 2007 without incident.

Defendant Marchelletta, Jr., is the President and a 25% owner of Circle. Defendant Marchelletta, Jr. is a family man. He has been married to Mrs. Sandy Marchelletta for 11 years. They are the parents of three young children: Jerry, age 10; Dawson, age 9; and Alyssa, age 7. Mr. Marchelletta, Jr., is a central figure in his children's lives. He is also the family's sole bread winner. Mr. Marchelletta, Jr. has been a resident in the Northern District of Georgia for more than 14 years. His strong ties to this community are undeniable.

Defendants would not risk fleeing the jurisdiction and leaving their families and business responsibilities behind. Defendant Marchelletta Sr., was sentenced to 33 months imprisonment and Defendant Marchelletta Jr., was sentenced to 36 months imprisonment. Their sentences are relatively short and do not constitute a significant incentive to flee. The Government did not oppose Defendants' release pending sentencing. After conviction but prior to sentencing, Defendants filed

three motions for travel outside the district. (Doc. 122,[3] 128, 132.)  All three were unopposed by the Government (*id.*), and all three were granted by this Court. (Doc. 123, 130, 133).  Significantly, after Defendants were sentenced, the Government did not object to voluntary surrender nor did it submit any concerns that required immediate incarceration, and this Court permitted Defendant to voluntarily surrender at their designated institutions. (*See* sentencing transcript on June 20, 2008 at 149-50; Doc. 154-55.)  As demonstrated by the overwhelming community support at the sentencing hearing, both Defendants have substantial familial, financial, and business ties to the community. Finally, as set forth above, subject to additional conditions of release, the Government agrees that Defendants are not a risk of flight or danger to any person or the community.

Defendants present no danger to the community or any individual, and the Government has never contended that they do. Rather, the community benefits from their good deeds, such as charitable contributions and support of their extended families.  Neither Defendant has any history of violent behavior, nor were they convicted of any crime that forecloses bail pending appeal.  Defendants have been hard-working, upstanding citizens all of their lives. Both Defendants clearly satisfy the threshold condition of 18 U.S.C. § 3143(b)(1)(A).

---

3. This motion was filed on behalf of Mr. Marchelletta, Jr., only.

**C. Defendants' Appeal is Not for Purpose of Delay.**

In light of Defendants' prompt filing of their notices of appeal (Doc. 162, 164), their expeditious arrangements for the completion of all transcripts in this case (including sentencing), and the relatively short length of their sentences of incarceration, this appeal is not for purpose of delay. It is also noteworthy that Defendants have promptly paid their special assessment and fines that this Court has imposed. As set out above, the Government has agreed that both Defendants meet this condition.

**D. Defendants' Appeal Will Present Several "Substantial Questions."**

The Eleventh Circuit employs the appellate standard set forth in *Giancola*, 754 F.2d 898, which adopted the Third Circuit's interpretation of 18 U.S.C. § 3143(b) as articulated in *United States v. Miller*, 753 F.2d 19 (3rd Cir. 1985), with additional comments.  In *Giancola*, the Eleventh Circuit vacated the district court's order that release pending appeal was improper and remanded the case to consider the defendant's motion pursuant to the Third Circuit rule adopted by *Giancola* and subject to *Giancola*'s observations.  *Giancola*, 754 F.2d at 901.  The district court had rejected the defendant's motion notwithstanding the fact that the defendant was not a flight risk, was not a danger to any person or the community, and had raised a substantial question of law or fact.  *Id*. at 899 n.2.  The district court had erroneously interpreted the statutory language "'likely to result in reversal or an

order for a new trial' to mean that a court may grant bail only if it finds that its own rulings are likely to be reversed on appeal." *Id*. at 900.

The Eleventh Circuit rejected this interpretation in favor of the Third Circuit's interpretation in *Miller*. "We [the Eleventh Circuit], too, are unwilling to attribute to Congress the intention to deny bail pending appeal unless the district court judge found that he or she had committed error but was obstinately unwilling to grant a new trial or other relief to correct the error." *Id*. Therefore, a district court is not required to find that the district court had ruled erroneously to find for the defendant that a "substantial question" will "likely result in . . . reversal, [or] an order for a new trial." 18 U.S.C. § 3143(b)(2)(B). Rather, the question of what "likelihood of reversal" means requires the Court to consider the following as articulated by the Third Circuit in *Miller*:

> [This language] must be read as going to the significance of the substantial issue to the ultimate disposition of the appeal. A question of law or fact may be substantial but may, nonetheless, in the circumstances of a particular case, be considered harmless, to have no prejudicial effect, or to have been insufficiently preserved. A court may find that reversal or a new trial is 'likely' only if it concludes that the question is so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.

*Miller*, 753 F.2d at 23 (adopted by *Giancola*, 754 F.2d at 900).

Therefore, once the Court determines a question is "substantial," the question turns to the effect on the case assuming the defendant prevails. Would the

defendant be entitled to a new trial, dismissal of counts of conviction, or a reduction in sentence?   An affirmative answer requires a grant of bail pending appeal.

Divining a convicted defendant's chances of finding a Court of Appeals panel that will agree with him is not the appropriate basis upon which to decide a motion for bail pending appeal.  Instead, "a 'substantial question' [is] 'one which is either novel, . . . has not been decided by controlling precedent, or . . . is fairly doubtful.'"   *Giancola*, 754 F.2d at 900 (quoting *Miller*, 753 F.2d at 23).   After adopting the Third Circuit's definition, the Eleventh Circuit made several observations.  Although "a 'substantial question' is generally one that has not been decided by controlling precedent," a frivolous question will not be substantial. *Giancola*, 754 F.2d at 901.

> In short, a "substantial question" is one of more substance than would be necessary to a finding that it was not frivolous.  It is a "close" question or one that very well could be decided the other way.  Further, there are no blanket categories for what questions do or do not constitute "substantial" ones.  Whether a question is "substantial" must be determined on a case-by-case basis.

*Id*. (cited with approval by *United States v. Shoffner*, 791 F.2d 586, 589 (7th Cir. 1986)).

As Judge Hodges articulated, that standard is best met at the district court level by determining if the district court can sincerely say there is no issue that is anything other than frivolous and no reason for appeal other than delay.  (Ex. A, at

2.)  This is particularly the case where a defendant could serve his or her entire sentence in prison before the appeal is resolved, as Judge Hodges noted in his recent order granting release pending appeal, where a 36-month sentence had been imposed.  (*Id.* at 1-2.)  As set forth in detail below, there are a number of substantial issues for the purposes of bond pending appeal.

### 1.  The First Substantial Question:
### Whether the District Court Should Have Given the Defendants' Requested Jury Instruction.

This Court should have given Defendants' requested Jury Instruction 15 "Good Faith Reliance Upon Accountant . . . Failure of Accountant to Exercise Due Care."  (Doc. 81, Ex. A at 27-28.)  In relevant part, the requested instruction was as follows:

> Good faith reliance on a qualified accountant… [is] a defense to willfulness in cases of tax fraud." So, a Defendant would not be "willfully" doing wrong if, before taking any action with regard to the alleged offense, the Defendant consulted in good faith an… accountant whom the Defendant considered competent, made a full and accurate report to that… accountant of all material facts of which the Defendant had the means of knowledge, and then acted strictly in accordance with the advice given by that… accountant.
>
> Whether the Defendant acted in good faith for the purpose of seeking advice concerning questions about which the Defendant was in doubt, and whether the Defendant made a full and complete report to the… accountant, and whether the Defendant acted strictly in accordance with the advice received, are all questions for you to determine.
>
> Also a complete defense to the charges in the indictment is where the tax violation was the result of a failure of an accountant to exercise due care or diligence, and not the result of the Defendants' actions. Title 26, Code of Federal Regulations, Section

16694-1 provides that an accountant or tax preparer who prepares taxes for a person "may not ignore the implications of information furnished to the preparer or actually known by the preparer. The preparer must make reasonable inquiries if the information as furnished appears to be incorrect or incomplete… The preparer must make appropriate inquiries to determine the existence of facts and circumstances required by a[n] [Internal Revenue] Code section or regulation as a condition to the claiming of a deduction.

(*Id.* at 27-28) (italics and footnotes omitted).

At the charge conference after the evidence was presented, this instruction was denied for the reasons set forth by the Court:

I find that the defense of good faith reliance on an expert's advice is designed to refute the government's proof that a defendant intended to commit an offense, and to succeed the defendant *must show*, one, that he fully disclosed all relevant facts to the expert and, two, that he relied in good faith on the expert's advice.  That's from *U.S. v. Johnson*, 730 F.2d 683, an Eleventh Circuit Case.

(*See* transcript of proceedings on September 28, 2007 at 1200) (emphasis added).

The Court's use of the term "show" came from *Johnson*.  *United States v. Johnson*, 730 F.2d 683, 686 (11th Cir. 1984) (citing *United States v. Smith*, 523 F.2d 771 (5th Cir. 1975)).  Looking closely at *Johnson*, however, the use of the word "show" was not intended to displace the general rule about when instructions are to be given, mainly by putting an evidentiary burden or "showing" on the defendants before they get an instruction.  The *Johnson* defendants were charged with making false statements to a federal government agency.  The defense presented in *Johnson* made good faith irrelevant to the analysis:  "The flaw in the

defendants' argument is that no expert advice was given to the defendants on which they relied." *Id*. The defendants' defense was a lack of knowledge that the information presented on the Small Business Administration and Farmers Home Administration forms was false, not that the defendant's relied on their attorney to properly fill out the government forms. *Id*. at 686-87. The necessary "showing" *Johnson* required was one of logical relevance to the defense, not one involving sufficiency of the evidence.

In *United States v. Eisenstein*, 731 F.2d 1540, 1543-44 (11th Cir. 1984), the Eleventh Circuit Court of Appeals approved a similar good faith instruction for reliance on counsel. The *Eisenstein* Court also used the word "show," but applied it properly in that the mere presentation of *any* evidence showing full disclosure was sufficient to allow the good faith reliance instruction. The instruction itself sets forth "full disclosure" as a factual question for the jury as a predicate to finding good faith, not a question for the court. *Eisenstein*, 731 F.2d at 1544. The Marchellettas' proposed instruction did the same thing: "[A] Defendant would not be 'willfully' doing wrong if . . . the Defendant . . . made a full and accurate report to that… *accountant* of all material facts . . ." (Doc. 81, Ex. A at 26-27) (emphasis in original and ellipsis before "accountant" in original). The instruction itself also makes clear that a reliance defense *is not an affirmative defense*, contrary to a common misunderstanding. The government bears the burden of proving intent

and willfulness at all times, and all the defense must do to obtain a good faith reliance instruction is to point to *some* evidentiary foundation to charge the jury on its theory of defense.

A refusal to give a requested theory of defense instruction is reversible error if the requested instruction: (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense. *United States v. Morris*, 20 F.3d 1111, 1115-16 (11th Cir. 1994).

All that is necessary to require a requested instruction on a theory of defense is that there be some basis both in law and in the evidence to support the instruction. *United States v. Orr*, 825 F.2d 1537, 1542 (11th Cir.1987); *see also United States v. Gold*, 743 F.2d 800, 819 (11th Cir.1984). The threshold burden a defendant must satisfy to have an instruction on his theory of defense is extremely low. *United States v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir.1995). "The law is clear that the defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." *United States v. Opdahl*, 930 F.2d 1530, 1535 (11th Cir.1991) (internal quotations omitted). The standard of evidence necessary to warrant a good faith reliance on

an accountant instruction "cannot include an absolute requirement that the taxpayer must testify, for that would burden the taxpayer's own Fifth Amendment right against self-incrimination." *United States v. Lindo*, 18 F.3d 353, 356 (6th Cir. 1994).

It bears noting that Judge Hodges gave a good faith reliance instruction in the *Snipes* case on the very slimmest of evidentiary predicates, having had substantial participation in drafting that Eleventh Circuit pattern instruction, and understanding that even the slimmest of evidentiary predicates demand the instruction be given and the issue put to the jury.

The record demonstrates that there was "foundation in the evidence" supporting Defendants' proposed jury instruction.  First, Defendants believed that their accountant, Gary Schwartz, was qualified to do the job.  Schwartz had decades of experience in private and public accounting. (*See* transcript of proceedings on September 21, 2007 at 20-25.)   Furthermore, Schwartz had provided accounting services for Stanley Schleger, Nastassi and Associates and Circle. (*Id.* at 29, 37, 131.) As Circle's accountant, Schwartz was familiar with construction industry, and had exposure to Circle's financial matters. (*Id.* at 29, 37, 131.)  Both Defendants believed in good faith that Schwartz was competent when Schwartz was hired to, among other things, audit Circle and prepare Defendants' personal tax returns. (*See id.* at 19, 39-40.) Additionally, Schwartz was paid a

substantial compensation, *i.e.*, $12,000, for the services he had contracted to provide. (*Id.* at 48.)

Second, full disclosure was made to Schwartz.  He testified that he worked closely with Theresa Kottwitz, Circle's bookkeeper, and she provided him with "as much information as possible." (*Id.* at 43.)  "No one ever tried to limit [Mr. Schwartz's] analysis [of books and records] in any way." (*Id.* at 60.)

Third, Defendants relied on Schwartz's advice in good faith.  First, the document introduced by the Government itself in which Mr. Marchelletta, Jr., behalf of Circle as its president, signed a letter to CPA Schwartz which said: "to the best of my knowledge and belief . . . I have made available to you all:  a. Financial records and related data.  b.  Minutes of the meetings . . ." (Gov't Exhibit 427.10, p. 1) (introduced by the Government in direct examination of Schwartz, transcript of proceedings on September 21, 2007 at 52).  Furthermore, during Attorney Parker's cross-examination, Schwartz admitted the Marchellettas relied on his professional advice:  "Q.  And you're the professional, you're the CPA.  [The defendants are] relying on that.  That's your audit function, isn't it, sir?  A.  Yes.  And – can I make a statement?" (*Id*. at 185.)

Schwartz's statement went on to describe why he discussed the tax matters with Defendant Kottwitz more so than with the Marchellettas.  (*Id*. at 185-86.)  But as Attorney Parker's cross-examination continued, Schwartz's testified:  "he

[Marchelletta Jr.] knew that Terry [Kottwitz] and I were doing the audit together." (*Id*. at 186.)  Schwartz continued:  "Mr. Marchelletta was very well aware that the audit was being done.  And he just seemed basically, really, not to really care about the numbers."  (*Id*. at 187.)  Schwartz's testimony was replete with testimony from which a jury could infer the Defendants relied on the professional advice of their CPA.  The citations are set out in the footnote below.[4]

This testimony supports two equally reasonable inferences.  First, that the Marchellettas did not care whether Schwartz successfully and accurately audited the books and financial statement, and ultimately the tax returns;  or, second, that the Marchellettas actually trusted the tax professional they hired to audit the books and decided to rely on his professional expertise to accurately present the company's books in the financial statements and tax returns.  When equally reasonable inferences may be drawn from the documentary and testimonial evidence, the jury must decide between those competing inferences.

One of the most significant issues was Circle's treatment of the consulting income from Nastassi.  Originally, the Circle Group classified it as income, but it was CPA Schwartz that decided to change its classification to a loan.  (*Id.* at 120-21).  As Schwartz testified:  "Well, what happened was it was first put into income and then the controller had told me that it was a return of capital, because upon the

---

4. Transcript of proceedings on September 21, 2007 at 32, 35, 37, 39, 46-47, 56, 60, 65, 91, 98, 103, 120-23, 125, 140, 144-46, 161-64, 173-75, 177-79, 181-87.

breakup of the companies, Mr. Marchelletta Senior was owed a lot of money.  So, that's what – *that's what brought me to say that it should have been in note payable rather than income*."  (*Id*.) (emphasis added).  This transaction clearly shows the necessary predicate for the good faith reliance on accountant instruction.[5]

As to building of the Marchellettas' respective homes, there is even evidence that CPA Schwartz may have noticed the accounts on the books and failed to question Kottwitz or the Marchellettas about that.  (*Id*. at 144.)  These accounts had zero income and over a million in expenses. (*Id*.)  Yet Schwartz did not question the Marchellettas or Kottwitz about it.  There is a reasonable inference that the Marchellettas and Kottwitz could have argued had the reliance instruction been given:  that the CPA said nothing because the CPA believed nothing was wrong.  The Marchellettas and Kottwitz had the right to argue that they had the right to rely on this silence.

The testimony of other witnesses in addition to CPA Schwartz also provided sufficient predicate evidence that Circle, Kottwitz, and the Marchellettas relied on their CPA auditors so that the jury instruction should have been given.  The

---

5.  Furthermore, as a result of this reclassification, CPA Schwartz admitted that he failed to inform Defendant Marchelletta, Sr., that this transaction affected his 2001 tax return which had just recently been filed (transcript of proceedings on September 21, 2007 at 181-82), even though he had it in mind. (*Id*. at 183).  *See also id*. at 184 (additional admission).

citations are set out in the footnote below,[6] which clearly show that substantial information was given to the CPAs and that the CPAs provided guidance as to specific journal entries.  While an inference might be drawn from some of the evidence that the Defendants had bad motives, a different inference could have been drawn by the jury had the Marchellettas had the opportunity to argue they believed they did all they could to provide the CPAs with all relevant information. The denial of the good faith reliance instruction foreclosed the opportunity for the Marchellettas to present their reliance theory to the jury.

In addition, Defendants did not have any experience in tax and financial matters.  In fact, Schwartz had acknowledged that Defendant Marchelletta, Sr. was not a "book man," and he had rarely reached out to him for information. (*Id.* at 174-75.)    Schwartz also admitted that if he had questions when preparing Mr. Marchelletta Sr.'s tax returns, he "would call [Sr.'s wife] Marge."  (*Id.* at 174.) Schwartz testified that Mr. Marchelletta, Sr. "wasn't in the context or the mood,

---

6. Through testimony of Robert Seay, the prior testimony from an arbitration hearing of Defendant Kottwitz:  "We have an outside CPA firm to do our auditing."  (Transcript of proceedings on September 18, 2007 at 309.) Testimony of Circle's Accounts payable clerk Kasandra Logan:  CPAs Schleger and Schwartz got copies of the JM Reports, payables reports and general ledgers.  (Transcript of proceedings on September 19, 2007 at 424-25.)  Logan's testimony: general ledger revisions discussed with CPAs. (*Id.* at 431.)   CPA Schleger's testimony:  CPAs were independent auditors. (*Id*. at 497.)  The other significant testimony of Schleger.  (*Id*. at 499; 501; 508; 510; 513; 518; 524; 530 (even CPA Schleger did not know the tax effect of the death clause in the consulting agreement).  Witness Kenya Diggs testified that CPA Schwartz was Circle's auditor.  (*Id*. at 563.)  Diggs testified that Schwartz would direct journal entries.  (*Id*. at 582-84.)

really, to discuss anything to do with the technicalities of the books or records." (*Id.* at 186.)  As to Mr. Marchelletta Jr., Schwartz testified that Jr. "was very busy," and admitted that "it was difficult to get his attention."  (*Id.* at 131.)  Defendants did the only thing they knew how to do – bid on jobs and run a construction business.  With only a high school education, blind in one eye, and 73 years old, Mr. Marchelletta Sr., entrusted Schwartz with the preparation of corporate and personal tax returns.  Mr. Marchelletta Jr., the President of Circle and the driving force behind its success, was just too busy to be involved in the preparation of the tax returns; he hired a paid professional to do them.  In conclusion, Defendants' detrimental reliance on Schwartz's advice is clear.

Finally, there was more than sufficient evidence that Schwartz failed to exercise due care or diligence in discharging his duties.  Schwartz was paid a substantial amount of money for his services, yet he chose to inspect Circle's books and records only for two days a year. (*Id.* at 41, 162.)  He admitted that he could have stayed in Atlanta and examined the records for as long as he had wanted. (*Id.*  at 162.)  Schwartz admitted that it was "quite difficult" to audit Circle in just two days and more "man-hours" were needed to do the job he was hired to do properly. (*Id.* at 46, 171.)  However, year after year, Schwartz continued to audit Circle, his biggest and most important client, only for two days a year.  (*Id.* at

186.) Schwartz admitted that Newport Bay and Crabapple jobs should have raised a red flag, but he "may have not noticed it." (*Id.* at 65.)

The requested jury instruction on good faith reliance was a correct statement of the applicable law.  A large part of Defendants' defense was compromised by the absence of an adequate instruction on their good faith theory of defense, so it dealt with an important point of law and the failure to give the requested instruction severely impaired Defendants' defense. *Moore*, 20 F.3d at 1115-16. The prejudice is amplified in a case where, as here, the evidence against Defendants, especially as to intent, was limited and circumstantial, while there was clear evidence supporting the proffered defense. This, too, presents a substantial issue for purposes of granting Defendants bond pending appeal.

## 2. The Second Substantial Question:
### Unsigned, Unfiled, 2001 Tax Draft Returns Should Not Have Been Admitted.

The unfiled unsigned draft tax returns for 2001 should not have been admitted at trial.  Although the defense sought to exclude this evidence (Doc. 41), this Court adopted the Magistrate's Report and Recommendation (Doc. 65), on the issue overruling Defendants' objections. (Doc. 73).  At trial, the Government used the unfiled 2001 tax returns in an effort to prove intent and willfulness on the part of Defendants.

At trial, the Government introduced Mr. Marchelletta Sr.'s and Mr. Marchelletta Jr.'s unfiled unsigned personal draft returns for 2001 prepared by accountant Gary Schwartz. (Gov't Ex. 497, 436.)    These draft returns, among other things, did not include house construction expenses. This exhibit came from Schwartz's work files.   Significantly, neither Defendant had signed the draft returns. (*See* Schwartz testimony, transcript of proceedings on September 21, 2007 at 118-19, 146.) Schwartz had not signed them either. (*Id.* at 146.)    The Government failed to offer any evidence that either Defendant Marchelletta even saw the draft returns or that Schwartz discussed the returns with them. Notwithstanding the issues listed above, the Government included the unfiled returns in its calculations of unreported income. (*See* Lesso testimony, transcript of proceedings on September 26, 2007 at 245, 260.) In fact, Revenue Agent Lesso, the Government's summary witness, admitted that he did not even review the actual returns that Defendants filed for 2001. (*Id.* at 336.) In addition, the Government made the unfiled 2001 returns the linchpin of its closing argument.  It argued that unfiled returns would have been filed if not for the check intercepted at Memphis FedEx facility, and proved that Defendants would have continued with "their scheme." (*See* transcript of proceedings on October 1, 2007 at 1245.) Thus, with no factual linkage to Defendants, the Government was able to argue to the jury that unfiled, unsigned documents supported a finding of criminal intent to

commit the crimes charged. As a consequence, the admission of this testimony and argument is a substantial issue for purposes of granting Defendants bond pending appeal.

### 3.  The Third Substantial Question:
***Boulware v. United States*, __ U.S.__, 128 S.Ct. 1168 (2008), Implications**.

In *Boulware v. United States*, __ U.S.__, 128 S.Ct. 1168 (2008), a unanimous United States Supreme Court directly applied the specific Internal Revenue Code sections that control the tax characterization, computation, and reporting requirements of a closely held corporation's distributions made on behalf of a shareholder for his personal benefit.  Thus, this case is directly on point in regard to the expenses related to the construction of Defendants' homes and other expenses (with the exception of the Nastassi payments).  The Government's entire theory of prosecution, including its unjustified claims regarding *the proper timing* of income recognition by Defendants of monies that Circle paid to third parties, is gutted by *Boulware.*

The *timing* of the recognition of the corporate diversions in *after* the corporate books were closed, as established by *Boulware*, is exactly the position Defendants took at trial regarding the appropriate taxable year.  The main issue at trial was whether the monies spent in construction of homes, architect fees, landscaping, *etc*., should be recognized as constructive income to Defendants in 2000 (as the Government contended) or 2001 (as Defendants contended).

*Boulware* supports Defendants' contention that the income was correctly recognized in 2001.

In *Boulware*, the Supreme Court emphasized that regardless of the facts of any particular criminal tax case, "tax classification, like 'dividend' and 'return of capital' [or 'loan' or 'compensation'] turn on the objective economic realities of a transaction rather than the particular form the parties employed; a given result at the end of a straight path is not made a different result … by a devious path." *Boulware*, 128 S.Ct. at 1176 (internal citations and punctuation omitted).  The economic realities of this case dictate that Defendants appropriately recognized as taxable income the monies spent by Circle in its fiscal year ending March 31, 2001 for the benefit of the Defendants as taxable income to them in 2001.

*Boulware* also nullified Revenue Agent Lesso's position disallowing credit for deductions that Circle took for distributions to others when it paid for Defendants' alleged personal expenses because the payments were not "recorded as salary expenses." (*See* transcript of proceedings on September 27, 2007 at 265. "[H]ad it been classified as a salary…that would have been an expense that [Circle] could have taken." (*Id.* at 266.)

As the Supreme Court re-affirmed in *Boulware*, the economic realism of any transaction is the "touchstone" of the tax law, not the correctness of accounting entries.  *Boulware*, 128 S.Ct. at 1176.  In this case the economic substance is as

follows.   To the extent any Circle distributions may be taxable income to Defendants as compensation, such distributions were also deductible by Circle regardless of the accounting entries.

In *Boulware*, the United States Supreme Court held that:

> Sections §§ 301 and 316(a) govern the tax consequences of constructive distributions made by a corporation to a shareholder with respect to its stock.  A defendant in a criminal tax case does not need to show a contemporaneous intent to treat diversions as return of capital before relying on those sections to demonstrate no taxes are owed.

128 S.Ct. at 1182.   This holding is squarely applicable to this case.   Under *Boulware*, the proper time to determine whether distributions to third parties are constructive dividends *is after the corporation's books are closed*.   The Supreme Court stated that whether a tax deficiency occurred from defendant Boulware's corporate diversions turned on whether the funds diverted were a taxable dividend or a non-taxable return of capital.  *See* 26 U.S.C. §§ 301 and 316(a).  "Sections 301 and 316(a) together thus make the existence of 'earnings and profits' the decisive fact in determining the tax consequences of distributions from a corporation to a shareholder with respect to his stock."  *Boulware*, 128 S.Ct. at 1173-74.

The Supreme Court's decision in *Boulware* contradicts the Government's theory of taxation presented to the jury *as to the timing* of when the individual shareholders-Defendants had to recognize as income the payments that Circle made to third parties.  Here, Circle's payments to vendors that constructed homes,

architects, landscapers, apartment owners, tailors, to name a few, were payments to others. These monies were not paid directly to either Defendant. Consequently, whether or not any monies that Circle paid to third parties may be taxable as income to Defendants must be determined *after* Circle's books were closed, *i.e.*, June or July after Circle's fiscal year closed, which is March 31. (*See* Schwartz testimony, transcript of proceedings on September 21, 2007 at 43.)

"A shareholder receives a constructive dividend to the extent of the corporation's earnings and profits if the corporation pays a personal expense of its shareholder or the shareholder uses corporate property for a personal purpose." *Kerns v. C.I.R.*, 87 T.C.M. (CCH) 1082 (2004). If the earnings and profits requirement is met, a payment is a constructive dividend if the corporation has offered an economic benefit on the shareholder "without expectation of repayment." *United States v. Smith*, 418 F.2d 589, 593 (5th Cir. 1969).[7]

Accordingly, if the corporation conferred an economic benefit on the shareholders *with the expectation of repayment*, then the corporation has "loaned" the money to the shareholder. Of course, the corporation may also determine *after* the close of its books that the monies paid for personal expenses of the shareholder constitute compensation to the shareholder. This obvious and clear accounting

---

7. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

principle was recognized by Revenue Agent Lesso in his testimony. (*See* transcript of proceedings on September 27, 2007 at 275-80.) Revenue Agent Lesso acknowledged that the entry in question had no identity other than that of an accounting entry evidencing Circle's payment to others, until accountant characterized an accounting entry in Circle's books by the end of the year and adjusted the entry. Circle produced no monthly statements. It produced no interim statements. Its only statements were final, produced by Schwartz *after* his audit and Circle's books were closed.

In conclusion, whether monies that Circle distributed over its fiscal year (April 1 through March 31 of the next calendar year) to third parties were taxable income to Defendants cannot be determined until *after* its books were closed. At that time, *after* Schwartz made adjusting entries, the proverbial "die was cast" and the monies were characterized as income or not to Defendants. Consistent with *Boulware*, it was at that time and in that calendar year that each shareholder/Defendant recognized the Circle distributions as constructive income (either dividends or compensation):

> Section 316(a)(2) conditions treating a distribution as a constructive dividend by reference to earnings and profits, and earnings and profits are to be "computed as of the close of the taxable year…without regard to the amount of the earnings and profits at the time the deliberation was made." A corporation may make a deliberate distribution to a shareholder, with everyone expecting a profitable year and considering the distribution to be a dividend, only to have the shareholder end up liable for no tax if the company

> closes out its tax year in the red (so long as the shareholder's basis
> covers the distribution); when such facts are clear at the time the
> reporting forms and returns are filed, the shareholder does not
> violate § 7201 by paying no tax on the moneys received, *intent
> being beside the point.*

*Boulware*, 128 at 1179 (emphasis added).

Thus, as to Circle's distributions from April 1, 2000 to March 31, 2001 to others, which the Government contended at trial were for personal expenses of its shareholder/Defendants, the characteristics of those distributions as income (dividends or compensation) to the shareholders was not made until 2001. Accordingly, the *timing* of the recognition of income was not as the Government contended at trial, nor can it identify any law requiring the recognition to be in 2000 as opposed to 2001, which is the very year Defendants recognized such payments as income and paid taxes. This argument presents a substantial issue for purposes of release on bond pending appeal.

### 4.  The Fourth Substantial Question:
**The Government Improperly Presented Cumulative Evidence and Argument Designed to Prejudice the Jury against Defendants Based on Their Wealth, and Improperly Invoked the Pecuniary Interests of the Jury.**

The Government improperly emphasized Defendants' wealth in its opening statement and closing argument in an effort to prejudice the jury against Defendants.  In addition, during the trial, the Government presented cumulative evidence, including, but not limited to: (1) pictures of Defendants' houses; (2) witnesses who testified to the alleged lavish nature of the Newport Bay and

Crabapple homes; and (3) numerous checks that allegedly were improperly issued to third parties, that resulted in an improper prejudice against Defendants. In addition, the Government Improperly Invoked the Pecuniary Interests of the Jury in Opening Statement by Referring to "Taxpayers" as "Victims."

"[A]ppeals to class prejudice are highly improper and cannot be condoned and trial courts should ever be alert to prevent them," and "[t]hey do not comport with the standards of propriety to be expected of the prosecutor." *United States v. Socony Vacuum Oil Co.*, 310 U.S. 150, 239, 60 S.Ct. 811, 852 (1940). "[A]ppeals to wealth and class biases can create prejudicial error, violating a defendant's right to due process of law under the Fifth Amendment." *United States v. Jackson-Randolph*, 282 F.3d 369, 376 (6th Cir. 2002). "Much, probably most, wealth and affluence are gained through, honest and socially desirable or socially neutral means such as hard work, innovation, successful investments, inheritance, good luck, etc." *Id.* at 377.

Furthermore, any evidence of a defendant's financial condition, lifestyle or personal expenditures must first meet the relevancy requirement found in Fed. R. Evid. 401. Rule 401 provides that relevance is demonstrated by "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without evidence." The

relevant issue here was whether the tax laws were violated by the manner in which these expenditures were reported, not the lifestyle of the Defendants.

As recently as last year, the Eighth Circuit recognized that "[r]emarks invoking the individual pecuniary interests of jurors as taxpayers are universally viewed as improper." *United States v. Palma*, 473 F.3d 899, 902 (8th Cir. 2007) (citing *United States v. Schimmel*, 943 F.2d 802, 806 (7th Cir. 1991)); *United States v. Blecker*, 657 F.2d 629, 639 (4th Cir. 1981)); *United States v. Lotsch*, 102 F.2d 35, 37 (2nd Cir. 1939)); *United States v. Smyth*, 556 F.2d 1179, 1185 (5th Cir. 1977)).

During the opening statement, the Government stated the following about Defendant Marchelletta, Jr.'s house:

> It had a pond, creeks, horse trails. And he had a builder build for him what would be a 6,000 square foot custom home, literally a million dollar home, all the bells and whistle, every upgrade imaginable.
>
>        \*   \*   \*
>
> [C]ustom mahogany library that cost $10,000 -- tens of thousands of dollars, custom made and shipped from Rhode Island. You're going to here (sic) about a pizza oven in the kitchen that cost itself tens of thousands of dollars to install. Not the granite countertops, not the custom cabinets, not the hardwood, not the Subzero appliances; the pizza oven alone, tens of thousands of dollars. You're going to hear about the home movie theater in the basement. And you're going to hear about  the foyer, forged metal decorative staircase that cost $36,000. Not the banister, not the hardwood stairs, not the marble all around, but the metal alone cost $36,000. And you're going to hear about the little part of the Sistine Chapel that he had recreated in his dining room. You're going to see the

stonework all throughout the outside, the marble all throughout the inside.

(Transcript of proceedings on September 17, 2007 at 14.)

The Government's inflammatory remarks to "posh houses," "multimillion dollar mansions," "spectacular homes," "personal slush funds," "funneling and siphoning money," "extravagant" are too numerous to count. The Government took unfair advantage of the complexity of this case by distracting the jury with the inflammatory remarks directed at Defendants' wealth, rather than educating the jury on the relevant and important tax issues. This Court's failure to offer "appropriate admonishments to the jury," *Sizemore v. Fletcher*, 921 F.2d 667, 670 (6th Cir. 1990) (affirming issuance of a writ of habeas corpus in a case where, among other things, the prosecutor's statements during closing argument appealed to wealth and class biases), compounded the prejudice to Defendant.

In its closing argument, the Government argued the following about Defendant Marchelletta, Sr.:

> This is not a small house in some new area of Atlanta that is developing where you're out in the farm field. This is one of the nicer parts of Alpharetta. That is a spectacular home that has many of the amenities that many homeowners would want in their house, particularly if they have kids and grandkids that they want to have over. Yet, it wasn't paid for by Mr. Marchelletta Senior. It was never intended to be paid for by Mr. Marchelletta Senior.

(Transcript of proceedings on October 1, 2007 at 1255-56.)

35

Furthermore, the Government urged the jury to make an inappropriate distinction between "the regular citizens" and Defendants: "[F]or somebody who's running $700,000 balances in his bank accounts over 2000 and 2001, wouldn't it have been possible for him to *get a mortgage like all the rest of us do?*" (*Id.* at 1257) (emphasis added).  In addition, the Government argued:

> *These are things that all of us would like to have, but we'd have to get a mortgage for it.*  We'd have to pay finance charges.  *Think of your own mortgage and how much equity you actually pay each month on the mortgage.*  Well, his equity is in a 1.9 million dollar house that he got a $300,000 mortgage for.  So, 1.6 million dollars in equity without having to pay any money for it, without having to incur any finance charges associated with that mortgage other than the $300,000 mortgage itself, and he's coming out going home tonight living in that house that you see, looking forward to your consideration, that has wood paneling flown in from Rhode Island, that has tens of thousands of dollars of marble in it, that has a $25,000 fountain out in front of it, that has 6,000, maybe even 6,500 square feet of living space where the HVAC for it cost tens of thousands of dollars just to heat and cool it.

(*Id.* at 1261) (emphasis added).

Additionally, the Government presented 41 witnesses and introduced over 1000 exhibits in this case.  The Government showed blown-up images of various parts of Defendants' houses during the opening statement.   However, that apparently was not enough; the Government thereafter called numerous witnesses to testify about every single aspect of Defendants' houses: kitchen cabinets, garage doors, bathroom tile, windows, closets, pizza oven, *etc*.  The Government also

introduced countless checks and argued *ad nauseum* that they were improperly written to the third parties.

Finally, the statement made in the Government's opening statement was clearly improper: "And it is the United States here that is the victim of this case, the United States *and its taxpayers*." (Transcript of proceedings on September 1, 2007 at 28) (emphasis added). This was not a statement made in the heat of the moment and constituted reversible error.

The Government's conduct violated Defendants' due process rights. By introducing cumulative and inflammatory evidence, it intentionally obfuscated and concealed lack of evidence proving Defendants' criminal intent. This is a substantial issue for purposes of granting Defendants bond pending appeal.

### 5.  The Fifth Substantial Question:<br>Whether There was Sufficient Evidence to Support<br>Defendants' Conviction.

Both Defendants were convicted of Count One of the Superseding Indictment, which charged them with conspiracy under 18 U.S.C. § 371 to defeat the collection of taxes by the I.R.S. (Doc. 42 at 1-11.) Defendant Marchelletta, Sr., was also convicted of Count Four, which charged him with filing a false tax return for the year 2000, in violation of 26 U.S.C. § 7206(1). (Doc. 42 at 13-14.) Defendant was also convicted of Count Five, tax evasion in relation to his 2000 tax return under 26 U.S.C. § 7201. (Doc. 42 at 14-15.)

Defendant Marchelletta, Jr., was convicted of Count Three, which charged him with filing a false tax return for the year 2000, in violation of 26 U.S.C. § 7206(1). (Doc. 42 at 12-13.)   Notably, the jury acquitted him of Count Two, which charged him with filing a false tax return for the year 1999, in violation of 26 U.S.C. § 7206(1). (Doc. 42 at 11-12.)

Finally, both Defendants were convicted of aiding and abetting the filing of a false tax return as charged in Count Six.  (Doc. 42 at 16.)

All of these offenses require proof of *specific intent*.  *See United States v. Morris*, 20 F.3d 1111, 1115 (11th Cir. 1994); *see also United States v. Lankford*, 955 F.2d 1545, 1550 (11th Cir.1992); *Sansone v. United States,* 380 U.S. 343, 351, 85 S.Ct. 1004, 1010 (1965).   Additionally, as to each of these counts, such specific intent may be negated by a good-faith misunderstanding of the law or a good-faith belief that one is not violating the law, regardless of whether or not the belief is reasonable. *Morris*, 20 F.3d at 1115; *see also Cheek v. United States*, 498 U.S. 192, 202, 111 S.Ct. 604, 610-11 (1991).

In order to sustain a conviction under 18 U.S.C. § 371, the Government must prove: "(1) the *existence of an agreement* to achieve an unlawful objective; (2) the defendants' *knowing and voluntary participation* in the agreement; and (3) the *commission of an act* in furtherance of the agreement." *See United States v. Adkinson*, 158 F.3d 1147, 1153 (11th Cir. 1998) (emphasis in original).  "The

government must prove an agreement between at least two conspirators to pursue jointly an illegal objective." *Id.* "The government must also prove beyond a reasonable doubt that each defendant had a 'deliberate, knowing, specific intent to join the conspiracy.'" *Id.* (citations omitted).

A Section 371 conspiracy where, as here, the alleged victim is the IRS and the objective is to defeat its lawful functioning is known as a *Klein* conspiracy. *Id.* at 1154; *see also United States v. Klein*, 247 F.2d 908 (2d Cir. 1957). "While the alleged failure to properly report income can constitute the requisite act in furtherance of a *Klein* conspiracy, the government must still allege and prove there was an *agreement* whose purpose was to *impede the IRS* (the conspiracy), and that each defendant *knowingly participated* in that conspiracy." *Adkinson*, 158 F.3d at 1154.

In regard to filing a false tax return, or aiding and abetting such a filing, "the government must prove that: (1) there was a making and subscribing of a tax return which contained a written declaration that it was made under the penalties of perjury; (2) the maker or subscriber did not believe the return to be true and correct as to every material matter; and (3) the maker or subscriber acted *in a willful, as opposed to a negligent manner*." *See United States v. Edwards*, 777 F.2d 644, 651 (11th Cir. 1985) (emphasis added).

The essential elements that must be established to prove a violation of 26 U.S.C. § 7201 (attempt to evade or defeat tax) are: (1) willfulness; (2) the existence of a tax deficiency; and (3) an affirmative act constituting an evasion or attempted evasion of the tax. *Sansone,* 380 U.S. at 351, 85 S.Ct. at 1010; *see also United States v. Williams,* 875 F.2d 846, 849 (11th Cir. 1989).

On appeal, sufficiency is subject to a *de novo* standard of review. *United States v. Miles*, 290 F.3d 1341, 1355 (11th Cir. 2002). Evidence is viewed "in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." *Id.* A jury's verdict will be affirmed if the Court finds that a "jury was rationally able to find that every element of the charged crimes was established by the government beyond a reasonable doubt." *United States v. McCarrick*, 294 F.3d 1286, 1289-90 (11th Cir. 2002).

The issue of sufficiency as to Defendants' convictions has been extensively briefed by both parties. (Doc. 127, 129, 131.) This Court has denied all Defendants' motions for judgment of acquittal. (Doc. 134.)  For the reasons set forth in his prior pleadings, Defendants respectfully submit that the sufficiency of the Government's proof of the requisite specific intent to violate the tax laws is a substantial issue, notwithstanding this Court's denial of his post-trial motion. Additionally, Defendants submit that the Supreme Court's ruling in *Boulware*, 128

S.Ct. 1168, as discussed in detail in "Defendants' Joint Brief in Support of Objections to PSR," filed on June 2, 2008 (Doc. 151), adds significant support to their contention as to sufficiency, as to the lack of specific intent to either evade taxes or file a false tax return, or conspire to defeat the collection of taxes. Defendants adopt all of these previously filed arguments in support of their showing that the sufficiency of the evidence on all counts of conviction presents a substantial issue for purposes of release on bond pending appeal.

### 6. The Sixth Substantial Question:
### Acquitted Conduct and the 2001Draft Tax Returns Which Were Never Signed Or Filed Should Have Been Excluded from Loss Computation at Sentencing.

Although district courts can consider acquitted conduct at sentencing so long as the sentence imposed does not exceed the statutory maximum authorized by the jury's verdict, the relevant conduct must be proved by a preponderance of the evidence. *See United States v. Poyato*, 454 F.3d 1295, 1297 (11th Cir. 2006).

When determining the loss amount attributable to a particular defendant convicted of a conspiracy offense, the district court must first determine the scope of criminal activity the defendant agreed to jointly undertake, and then consider all reasonably foreseeable acts and omissions of others in the jointly undertaken criminal activity.  *United States v. McCrimmon*, 362 F.3d 725, 731 (11th Cir. 2004) (money laundering conspiracy).  Loss is often not calculable with precision; therefore, this Circuit requires the district court only make a reasonable estimate of

the loss, given the available information.  *United States v. Yeager*, 331 F.3d 1216, 1224 (11th Cir. 2003) (mail fraud conspiracy).   The district court, however, "cannot merely speculate as to the proper amount of loss, and, if the amount suggested by the government is contested, *the government must support its estimate with reliable and specific evidence*." *Id.* (internal citations and punctuation omitted) (emphasis added).

Here, the Court computed loss by attributing unreported expenses and income of both Defendants to all three Defendants. First, Mr. Marchelletta, Jr., was acquitted of Count Two, which involved the following allegedly unreported expenses: (1) Hong Kong tailor ($4,744.60); (2) Gold Club expenses ($8,402); and (3) $250,000 loan to Mr. Marchelletta, Jr.  All of these issues were hotly contested and disputed at trial.   The jury accepted Mr. Marchelletta, Jr.'s arguments and believed his, and not the Government witnesses.   However, this Court included the combined amount of $263,000 from Count Two, and ironically, held all three Defendants accountable for it.   This amount should not have been included because: (1) the Government failed to establish by the preponderance of the evidence that $263,000 should have been included in the loss amount; or, alternatively, (2) findings by preponderance of the evidence violated Defendants' Fifth and Sixth Amendment rights.

Second, the Court should have excluded Hong Kong Tailor expenses, a total of $12,898.23 for 2000 and 2001 for the following reasons.  First, because jury acquitted Mr. Marchelletta, Jr. of Count Two, it is reasonable to assume that jury believed that these expenses were *de minimis* or simply was a result of an account error in years 2000 and 2001.  Second, Mr. Marchelletta, Jr. properly reported these expenses on his actual 2001 personal income tax returns.

Third, the personal and corporate draft returns for 2001 should have not been included in the tax loss calculations for the following reasons.  First and foremost, the Government failed to even introduce Circle's unfiled, unsigned corporate returns for the fiscal year ending March 31, 2001 into the evidence.  There is absolutely nothing in the record regarding this corporate return.  Second, as previously argued, there was no evidence presented at trial or sentencing that Defendants signed or even saw the draft returns, or that these papers were finalized or submitted to the IRS.  *See supra*, "Unsigned, Unfiled, Draft Returns Should Not Have Been Admitted."  Finally, important tax policy considerations strongly counsel against adopting the Court's approach on the draft returns.  As all tax practitioners know, the process of auditing a corporation's books and records for the purpose of filing actual, signed returns for the corporation and corporate officers is a lengthy process with many stages.  The tax code is indeed lengthy and complicated, and the CPA is working with a mix of tax/financial facts and legal

principles as the process moves forward. Oftentimes during this accounting process, not just one, but *many* "draft" returns are prepared by the accounting professionals as they make tax characterizations and computations. Draft returns are not intended to be substantively accurate; in other words, although these documents take the "form" of returns, they do not purport to be the final, actual, reviewed, and signed returns submitted to the IRS. Instead, they are an essential part of a CPA's work product – part of the necessarily incremental paper flow that attends this sort of important tax work.

Fourth, in light of *Boulware*, the Court erred by including the Defendants' home construction costs, consulting fees, landscaping and apartment rent expenses for 2000 into the loss amount. *See supra*, "*Boulware* Implications." Defendants properly accounted for all of these items on their tax returns as filed. Furthermore, the landscaping expenses should have never been included in the loss calculation because they were a result of a clerical mistake with no fault on the part of Defendants. In addition, as extensively argued at trial, the rent expenses and payment of architect fees were appropriately deducted by Circle and did not constitute income to Mr. Marchelletta, Sr.

Fifth, as to the $250,000 that Nastassi and Associates paid to Circle in February 1999, there is no evidence supporting any argument that the money was income to Mr. Marchelletta, Sr. Nastassi loaned its subsidiary Circle that money.

Both companies' books reflected the transaction as a loan from Nastassi to Circle. There is no evidence contradicting the nature of this transaction.  The money was not taxable to Mr. Marchelletta, Sr., and it should have not been included in the loss amount.

Finally, as to the Nastassi payments to Circle in 2000 for consulting fees, that money was always taxable income to Circle.  That is how Circle booked the payments until September 2001 when Schwartz unilaterally revised the entry. Circle recognized the money as income in its fiscal year ending March 31, 2000 and would have recognized it as income for the fiscal year ending March 31, 2001, but for Schwartz's adjusting entry, an act no Defendant knew was done.  The Nastassi payments were not taxable income to Mr. Marchelletta, Sr.

In conclusion, the loss amount found in this case should be under $400,000, which sets the offense level at 18 with the guideline range of 27-33 months imprisonment.  If Defendants prevail only as to the loss amount calculation on appeal, this case will be remanded for re-sentencing.  In light of the fact that the Court varied downward when it sentenced Mr. Marchelletta, Sr. to a term of 33 months and Mr. Marchelletta, Jr. to 36 months, this Court could, in the exercise of its discretion, choose to impose a substantial downward variance at re-sentencing in light of a significantly reduced loss amount. (*See* sentencing transcript at 106-07, 144, 148 (where this Court stated that the "driving force" for the sentences

imposed was the large loss amount)).  As a consequence, it is at least possible that this Court might seriously consider a "Zone B" sentence under U.S.S.G. § 5C1.1(b), especially in light of Mr. Marchelletta, Sr.'s age and medical condition, and Marchelletta, Jr.'s family obligations, and sentence Defendants to home detention or community confinement either with or without any imprisonment.  Accordingly, this Court may decide to re-sentence Defendants to less time than what it would take the Eleventh Circuit Court to decide his appeal. This argument presents a substantial issue for purposes of release on bond pending appeal.

## CONCLUSION

Defendants pose no risk of flight or danger to any person or to the community, as the Government agrees (subject to additional conditions of bond). Their case presents a number of substantial issues that will be pursued vigorously on appeal.  If any of these issues are determined favorably on appeal, they will result in either an outright reversal, a new trial, or a substantially reduced sentence. Again, subject to the caveats set forth above, the Government does not contest that Defendants' appeal presents substantial issues for purposes of making this bond determination. As a consequence, this Court is well justified in granting Defendants' unopposed motion, and permitting Defendants to remain on bond

pending appeal upon its satisfaction of whatever additional conditions or restrictions this Court deems appropriate.

WHEREFORE, Defendants respectfully pray that this Court enter an Order granting their Motion for Bond Pending Appeal, and such further and additional relief as this Court deems just and proper.

This 14th day of July, 2008.

Respectfully submitted,

**/s/ Wilmer Parker**
**WILMER PARKER**
Georgia Bar No. 563550
parker@mjplawyers.com
Attorney for Defendant Marchelletta, Sr.

**/s/ Bruce Maloy**
**BRUCE MALOY**
Georgia Bar No. 468525
maloy@mjplawyers.com

**/s/ Agne Krutules**
**Agne KRUTULES**
Georgia Bar No. 141692
krutules@mjplawyers.com

Attorneys for Defendant Marchelletta, Jr.

**Maloy Jenkins Parker**
75 Fourteenth Street, NW
25th Floor
Atlanta, GA 30309
Phone: (404) 875-2700
Facsimile: (404) 875-8757

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have duly served a copy of the foregoing "Joint Unopposed Motion for Bond Pending Appeal" to all counsel of record in this matter via electronic filing.

This 14th day of July, 2008.


<u>/s/ Agne Krutules</u>
**AGNE KRUTULES**
Georgia Bar No. 141692

**Maloy Jenkins Parker**
75 Fourteenth Street, NW
25th Floor
Atlanta, GA 30309
Phone: (404) 875-2700
Facsimile: (404) 875-8757